Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| JANE DOE, | : | __ Civ. ____ (___)(___) |
| Plaintiff, | : | |
| v. | : | **COMPLAINT** |
| ARISKNIGHT WINFREE, LISAUREL WINFREE, JEAN WINFREE, DAVID WINFREE, MULTIKIULTUR A.K., AGENT AU PAIR INC., and RAFAEL BUJARA | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Jane Doe ("Ms. Doe"), by and through her undersigned attorneys, and for her Complaint alleges as follows:

### INTRODUCTION

1.      This case is about a carefully premeditated violent sexual assault perpetrated on October 13, 2022 by one defendant, Arisknight Winfree ("AW") who acted with the gross negligence support of other co-defendants (Lisaurel Winfree "LW"; Lisa Winfree "LW"; David Winfree "DW"; Multikultur E.K. "MEK"; Agent Au Pair Inc. "AAP"; Rafael Bujara "RB"), against plaintiff, ateenager who is an Italian citizen. Defendant took photos and videos of the entire sexual assault.

2.      On or around the spring of 2022, the plaintiff applied to participate to an au pair[1] program with a family based in United States. The program was offered by defendant MEK, a

_____

[1] An au pair is a young foreign woman/man who lives with a family on a legal visa (generally a J-1) up to two years and provides childcare and/or house support in exchange for a weekly stipend, room and board and the opportunity to better understand the culture of the hosting family while becoming a trusted support for the family.

Case 1:23-cv-00615-HYJ-SEC ECF No. 7, PageID.102 Filed 05/07/23 Page 2 of 33

Exhibit A

German company that has subsidiaries in several countries, including the United States, via its www.aupair.com platform (the "platform")..

     3.      On or around September 5, 2022, the defendant AW, posted an aupair position on the platform, purportedly as an American family named AK based in East Lansing, Michigan. Defendant AW contacted plaintiff through the platform, and after an introductory video call, defendant AW invited plaintiff to travel to Michigan and stay with the family to purportedly babysit defendant AW's niece, who is also defendant LW's daughter.

     4.      Plaintiff flew to Michigan on October 12, 2022 and defendant AW picked plaintiff up at the East Lansing bus stop and drove her to what was purportedly his home in the same town.

     5.      On October 13, 2022, defendant AW assaulted, handcuffed, and raped plaintiff. He took pictures and videos of the entire act. After the rape, he restrained plaintiff in a dark room for several hours.

     6.      In the early hours of October 14, 2022, defendant AW drove and dropped plaintiff to the East Lansing bus stop after having stolen her money and few clothes. Soon after, plaintiff was able to contact her family in Italy who bought an airline ticket to fly her back home where she was admitted into a local Emergency Room.

**PARTIES**

     7.      "Jane Doe" is a pseudonym. Jane Doe is a 19 years old Italian national. As necessary and required by this court, she is willing to file the appropriate motion to proceed pseudonymously. Defendant will readily know her identity from the allegations below.

     8.      Ms. Jane Doe is a legal resident of Livo, Trento, Italy.

     2.      Defendant Arisknight Winfree (a.k.a. "Stryker" or defendant AW) is a resident

# Exhibit A

of East Lansing, Ingham County, Michigan.

3.      Defendant Lisaurel Winfree (LW) is a resident of Ann Arbor, Washtenaw County, Michigan.

4.      Defendant Jean Winfree (JW) is a resident of East Lansing, Ingham County, Michigan.

5.      Defendant David Winfree (DW) is a resident of Westland, Wayne County, Michigan.

6.      Defendant Miltukultur E.K. (MEK) is a German company based in Helmholtzstrasse 50, Koln, Germany.

7.      Defendant Agent Au Pair Inc. (AAP) is US a corporation based in 837 Whalley Avenue, New Haven, Connecticut incorporated under the law of the State of Connecticut.

8.      Defendant MEK is the owner of www.AuPair.com an Internet platform.

9.      Defendant Rafael Bujara (RB) is an individual resident of Helmholtzstr. 50, Koln, Germany and the ultimate shareholder and beneficiary of defendant MEK and defendant AAP.

## JURISDICTION AND VENUE

10.      The events giving rise to this lawsuit occurred in East Lansing, Ingham County, Michigan.

11.      Jurisdiction is proper in this court under the diversity jurisdiction provisions of 28 USC § 1332 (a) (1), as some Defendants are resident of the western district of Michigan and the amount in controversy exceeds $75,000.

12.      Venue is proper in the Western District of Michigan per 28 USC § 1391 (b) (1) and (2), as one of the defendants resides in Ingham County, Michigan, and per 28 USC

Exhibit A

§ 1391 (c) (2) and (3), as the corporate defendants are subject to the Court's personal jurisdiction

and per 28 USC § 1391 (g) because a substantial part of the events giving rise to the claim

occurred in Ingham County, Michigan.

**FACTS**

13.     On or around April 2022, plaintiff, a teenager already working in the hospitality

industry, fluent in Italian and German, wanted to improve her English language fluency and

intercultural skills and was interested in an au pair experience in the United States.

14.     Around the same time, plaintiff created an account on the website

www.aupair.com and her profile for American families looking for au pairs. As well known in

the industry, many American families employ au pairs in order to have access to underpaid

labor. According to an NYTimes estimate, there are around 20,000 foreign au pairs in the US

market every year [2].

15.     On September 5, 2022, plaintiff received on the platform the following message

from an American family listed with the name "AK":

> "Hi, we think you'd be a great fit. We live in USA East Lansing MI,
> are 1 hour and a half from the beaches, and often travel. Please
> message me on whatsapp. +1-734-510-3594. We can discuss
> everything in detail there. Message me your full name, your
> instagram, what date you can come, how long you want to come for,
> and how you will be paying for your plane flight to the USA (I.e.
> your parents/grandparents/ yourself), and if you already have a
> passport or still need to apply for one. Please let us know how much
> allowance you want per week for pay. We cover all your expenses
> when you come. My name is Stryker. We are looking to fill the
> position immediately. Posted : 05 Sep. 2022"

16.     During the communications that followed (on WhatsApp phone messaging and

Instragram social media account), defendant AW (whose Instagram account is

---

[2] Jordan Salama, The Great Au Pair Rush, NYTimes, July 25, 2020,
https://www.nytimes.com/2020/07/25/business/the-great-au-pair-rush.html

Exhibit A

"**hunter_tiberius**") told plaintiff that his family was based in East Lansing, Michigan, looking to fill the position of an au pair for his niece. In this regard, he sent plaintiff pictures of his family, niece, sister, parents, beach house, and dog. He also told plaintiff that a weekly allowance would be provided.

17.     Around the same time, defendant AW instructed plaintiff that if she wanted to fill the position, there was no need to apply for a visa but an ESTA, a system that determines the eligibility of visitors to travel to the US under the Visa Waiver Program, would be sufficient. (an ESTA is Shortly thereafter, defendant AW sent plaintiff the link to register as an ESTA visitor.

18.     ESTA classified visitors are not allowed to work under US laws and can remain legally on US soil for a limited period of time, the maximum being 90 days. [3]

19.     Au pair work is in essence cheap labor generally being paid below the minimum wage threshold, that US families acquire from overseas. Several non-profit organizations have repeatedly proved that US authorities do not do enough to control the problem, and the sponsor agencies or host agencies (like defendant AAP) enrolling foreign young workers economically exploit young workers and US families. The International Labor Recruitment Working Group in 2018 reported that:

> "*Structural deficiencies in the J-1 au pair program […] contribute to labor rights abuses. Au pairs report wage theft, coercion, sexual harassment, retaliation, and misrepresentation, among other abuses. Among the range of temporary work visas available to domestic workers, the J-1 au pair program is the only program masquerading as a cultural exchange.*" [4]  […] "*The State Department's continued mischaracterization of the program as a cultural exchange rather than a work program enables sponsors and host families to abuse au pairs, while lack of enforcement by the*

---

[3] Section 217 of the Immigration and Nationality Act, 8 U.S.C. 1187.
[4] ILR, Shortchanged. The Big Business Behind the Low Wage J1 AU Pair Program, 2018, p.3
https://cdmigrante.org/shortchanged/

5

Exhibit A

*State Department allows these abuses to persist."* [5]

20.     Sexual harassments and abuses of migrant workers by US hosting families have

been systematically reported since 2013 by Prof. J. Chuang[6].

21.     Sponsor agencies in the US make millions of dollars from this black market:

> "*Each year about 20,000 au pairs are hired by American families,
> assisted by J-1 "sponsors," which can be either for-profit
> companies or nonprofit organizations that act as labor recruiters
> for families looking to hire foreign au pairs, and to which the State
> Department has mostly outsourced the management and oversight
> of the J-1 visa program.*
>   *The sponsors make money by charging the au pairs to participate
> in the program, as well as by charging fees to families in order to
> connect them to au pairs."* [7]

22.     Defendant AAP was a named defendant before the US District Court for the

District of Colorado in a putative class action case for violation of payment of federal and

several state minimum wage laws (case 1:14-cv-03074 CMA-KWT). The case settled in 2019

for approximately $65MM.

23.     On or around September 2022, defendant AW instructed plaintiff to book a

return ticket after 90 days and to provide the US immigration authorities with an address in

East Lansing that was not the one where defendant sexually assaulted plaintiff. He further

instructed plaintiff to tell the US immigration authorities that she was only visiting for tourism

and not for work.

24.     On October 11, 2022, plaintiff bought the airline ticket and flew to the United

States from Milan, Italy, to Detroit, with a connection in Newark, NJ. Once in Newark, NJ,

---

[5] *Id.* p.3

[6] Janie Chuang, *The U.S. Au Pair Program: Labor Exploitation and the Myth of Cultural Exchange*, 36 Harv.J.L.&Gender 269 (2013)

[7] Daniel Costa, *Au pair lawsuit reveals collusion and large-scale wage theft from migrant women through State Department's J-1 visa program*, Economic Policy Institute, January 15, 2019, https://www.epi.org/blog/au-pair-lawsuit-reveals-collusion-and-large-scale-wage-theft-from-migrant-women-through-state-departments-j-1-visa-program/

Exhibit A

Custom and Border Protection ("CBP") immigration officers asked plaintiff the reason for her visit and decided to stop her for a second interview.

25. CBP officers were not convinced by plaintiff's story and tried to reach defendant AW via phone. He did not respond to CBP various attempts. They instead called the parents of plaintiff who confirmed that she was invited as an au pair. She was admitted to the US after two hours but she missed the connecting flight to Detroit. The authorities helped plaintiff to reschedule the flight and reroute her to Detroit.

26. While waiting to board to the next flight to Detroit, plaintiff called defendant AW. This time, he took plaintiff's call. She informed him that she would arrive at the Detroit airport around 11:00 P.M. He told her that he would not go to the airport to pick her up but instructed her to take the Michigan-Flyer bus and get off at the Marriott stop in East Lansing, located at 333 Albert Street. Plaintiff spent the night on a chair at the arrivals of the Detroit airport because buses from Detroit to East Lansing were not operating at night.

27. On October 12, 2022, plaintiff took the first Michigan-Flyer bus, arrived in East Lansing and was picked up by defendant AW at the bus stop. Defendant AW picked her up in a blue BMW vehicle. They eventually arrived at 343 Highland Avenue, East Lansing, a property belonging to codefendants JW and DW.

28. As soon as they arrived, plaintiff noticed that all windows of the ground floor were covered by newspapers. Defendant AW told plaintiff to clean the house. She responded saying that she was there to babysit his niece but would accommodate his requests the next day. Defendant AW then told plaintiff that she had to take care of the niece only two weeks per month. Plaintiff noticed that the house lacked toys, clothing, or evidence typical of a toddler living there.

Exhibit A

29.     In the afternoon of October 12, 2022, defendant AW asked plaintiff to go with him to make a visit to a friend and to his dad. Once there, defendant AW introduced plaintiff to codefendant DW, his father, as the "au pair from Italy". After this visit, they went back to 343 Highland Avenue and around 8:00 P.M. plaintiff went to bed.

30.     The next day, on October 13, 2022, plaintiff started cleaning the house as instructed. She noticed that several rooms of defendant AW's house had video cameras installed. She immediately checked her room and her bathroom but apparently was not able to find any.

31.     Late that afternoon, around 7:00 P.M., defendant AW asked plaintiff to take a shower. She responded that she preferred to take a shower the next morning. He insisted firmly. Plaintiff was very uncomfortable and started to realize that something was not right.

32.     After the shower, defendant AW knocked on plaintiff's door and asked her to go down wearing the bathrobe only. She refused but he pressed her. She did not know how to handle the situation. Codefendants AAP and MEK did not provide a local reference point to call. She was overcome by fear. Unwillingly, she did what he asked. Once downstairs, he ushered her into his bedroom.

33.     In the bedroom, with the excuse of giving her an English lesson, defendant AW started touching plaintiff's legs. She immediately rejected him. Then, plaintiff stood up and went behind her and put his arm around her neck. Plaintiff tried to resist the lock but she was subjugated when he grabbed both plaintiff's arms and handcuffed her behind her back.

34.     Handcuffed, defendant AW ordered plaintiff to shut up and stay still. Defendant AW then put his hand on plaintiff's nose and mouth and then placed a gag ball on her mouth. Plaintiff was laying on her belly. Plaintiff felt defendant AW wanted to kill her.

Exhibit A

35.     Plaintiff realized that defendant AW started taking pictures from behind. He started touching plaintiff's genitals. While taking videos, he asked her whether she consented to him touching her and whether she liked it. While paralyzed by fear, she repeated what he asked. He asked her to raise her voice so she could be heard on the video.

36.     Defendant AW took more pictures and/or more videos while touching and penetrating plaintiff's genitals. He pulled her hair and forced her to consent to what he was doing. He asked her to loudly repeat "I do like it", "I do", "yes" several times while he was filming and taking more pictures. After a while, he removed the gag ball and she saw her own blood on the pillow.

37.     After a while, defendant AW brought plaintiff to an empty room upstairs. This room had a camera. Plaintiff was still handcuffed. Defendant AW let plaintiff fell down and she injured her left shoulder. Plaintiff noticed that from a closet defendant AW pulled a bag filled with sex toys. Defendant AW then tied plaintiff's ankles with a towel and placed a towel on her face.

38.     Defendant AW started penetrating plaintiff's vagina with various sex toys. While doing this, he was asking her to consent to such acts and to repeat "I like it". He slapped her butt repeatedly. For the first time in her life, plaintiff prayed God.

39.     Defendant AW turned plaintiff over and asked to have a full sexual intercourse so he could ejaculate inside her. He asked her to loudly incite him during the sexual act as she was liking it.

40.     As soon as defendant AW completed his sexual assault, plaintiff, shocked, traumatized, handcuffed, and unable to escape, implored defendant AW that she wanted to go back home. Defendant AW, however, left plaintiff in the same room with the towel and a

9

Exhibit A

sweater. In that room, plaintiff was still handcuffed and feet tied. Defendant AW instructed plaintiff to say nothing to anyone. He intimidated her saying that he worked for the US government. Plaintiff spent the rest of the night there.

41. During the entire sexual assault, defendant AW had sequestered plaintiff's phone, wallet, and computer.

42. On or around 2:30 A.M. of Friday October 14, 2022, defendant AW came into the room where plaintiff was laying and freed her. He ordered her to get dressed summarily and pack. He then drove and dropped plaintiff at the East Lansing bus stop where she soon realized he had stolen money from her wallet and had removed the SIM card from her phone. Alone at the bus stop and in the middle of the night, plaintiff was able to call her boyfriend in Italy (via Wi-Fi) and told him what happened. She arrived at the Detroit Airport at around 5:30 A.M. taking the Michigan-Flyer bus.

43. Plaintiff's parents were able to buy a new ticket and plaintiff flew back to Italy. She arrived in Milan on October 15, 2022. She went straight to the local emergency room of the Cles Hospital, Trento, Italy where she was administered a rape kit test.

44. On November 29, 2022, plaintiff filed a criminal complaint to the East Lansing Police Department.

45. On December 15, 2022, the United States Attorney's Office of the Western District of Michigan, notified a subpoena to testify before a grand jury. She appeared and testified before the grand jury on January 10, 2023.

46. On February 14, 2023, the Grand Jury of the US District Court of the Western District of Michigan, Southern Division, indicted defendant AW charging him of kidnapping

Exhibit A

as per 18 U.S.C. § 1201(a)(1); coercion and enticement under Michigan Compiled Law § 750.520d and 18 U.S.C. § 2422(a).

47.     On the same indictment and on the same day, it was ordered to seize defendant AW's assets among which: the real estate at 343 Highland Avenue, East Lansing, Michigan 48823, where he committed the sexual assault, and his personal properties among which cars, cash, various electronics, gag ball, and sex toys.

48.     On February 27, 2023, plaintiff hired a geneticist, Dr. Silvia Quattrone PhD, who completed a DNA test on the biological material found on the rape kit and on plaintiff's clothes. Ms. Quattrone found DNA evidence belonging to plaintiff and to a male.

49.     During the investigation following the sexual assault, plaintiff came to know that on June 26, 2022, defendant AW had tried to register with the Au-pair platform but he was initially rejected. On July 4, 2022, an employee of AuPair platform, owned by codefendant MEK, flagged defendant AW's application with a warning because:

> *"They texted many Au Pairs with the following words: 'A perfect aupair for us has no problem following instructions, obeys and respect the head of the family, enjoys being a nurturing influence. Bonus points if you enjoy cooking or other activities like reading, exploring, being active. Obedience is very important for us.'"*

50.     In the Au-pair platform application, defendant AK stated that he was a family with a child between 6 and 10 years old. He stated that:

> *"We cover everything else when you are here with the family including food, living arrangements, health insurance, cell plan, basic transportation, etc.".*
> *"We are seeking a very positive individual who can have a great time with us. We have had aupairs and done exchanges before and really enjoyed it."*
> *"We will pay for everything, as well as give you a weekly/monthly stipend/allowance. [...]*
> *If you think you are a good fit, feel free to message us and we will start getting to know each other better." [...]*
> *"We live in Michigan, are a 90 minute drive from the beach ..." [...]*

Exhibit A

*"We travel very often ... and if we are travelling you come with us, and of
course we pay for everything as well."*
*"Being a good listener, and being able to obey rules of the household".*

51.     The J-1 *Au Pair* Program is an official U.S. State Department cultural

exchange program that allows aliens aged 18-26 to work for "host families" and child

care workers for 45 hours per week for room, board, and compensation for child care

work.

52.     The U.S. Department of State has outsourced the implementation of the

program to a number of "sponsor" au pair agencies (22 C.F.R. § 62.31 (2020)). Such

sponsor agencies/corporations generate millions of dollars in revenue every year from

American families and from au pairs. Defendant AAP is a sponsor designated by the U.S.

Department of State.

53.     The sponsor agencies have no oversight from the U.S. State Department

with reference to recruitment and placement of alien workers with American families or

with compliance with rules and regulations at the federal or state level. Unsupervised

sponsor agencies control the au pair market and they set up thousands of young alien

female workers. Many of them end up being victims of various abuses once placed with

the host family. Because there is no supervision, and because sponsor agencies are not

required to put in place any control mechanisms, these agencies are aware they operate

lucrative hubs of modern slavery [8] and websites that work as global dating platforms.

54.     In 2015, the U.S. Department of State estimated around 3,500 complaint

per year from au pairs [9]. Namely every year, almost 2 au pairs out of 10 are victims of

---

[8] Tina Davis, *Au Pair Scheme: Cultural Exchange or a Pathway to Slavery*, Slavery Journal Today, Vol 1, 2, July 2014, p.1-22
[9] Zack Kopplin, "They Think We Are Slaves", Politico Magazine, March 27, 2017.

Exhibit A

abuses of any sort by US families. Senator Bernie Sanders in 2013 denounced the J-1 Au

Pair program as a scam [10].

     55.     Au pair companies are perfectly aware of the abuses they negligently and

recklessly facilitate to be committed. In Europe, the au pair situation is even more critical

because of the war in Ukraine and the immigration crisis from the Middle East and from

Africa. In 2004, 2011 and 2016, the European Parliament published several reports on

the abuse against au pair domestic workers [11]. All European countries have seen a recent

increase of sexual assault cases against young au pair females in Ireland, Denmark, Spain,

Norway, UK, Belgium, and Germany.

     56.     In 2021, the most important German NGO network against human

trafficking (the KOK – Bundesweiter Koordinierungskreis gegen Menschenhandel e. V.)

surveyed 612 cases and in 96% of these, women and girls were victims of various abuses

[12].

     57.     Because of their young age and their little working experience, sponsor

agencies take advantage of au pair alien workers because of this complete lack of safety

net. Sponsor agencies and US families are left free to easily predate against the most

vulnerable [13].

**Legal Allegations**

## COUNT I: ASSAULT AND BATTERY
### (Against Arisknight Winfree)

---

[10] *Id.*

[11] 2016 Report of the European Parliament available here https://www.europarl.europa.eu/doceo/document/A-8-2016-0053_EN.html

[12] Data available here https://www.kok-gegen-menschenhandel.de/kok-informiert/news/detail/datenerhebung-zu-menschenhandel-und-ausbeutung-in-deutschland-bericht-des-kok-2021

[13] Victoria Bejarano Hurst Muirhead, *"'I'd never let my sister do it': Exploitation Within the U.S. Au Pair Program"* Vol 61.1, Lewis & Clark L.R., 241-274, 266.

Exhibit A

58.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

59.     Defendant AW intentionallycontacted and offensively touched plaintiff without her consent, causing plaintiff to be in fear of an immediate battery, and defendant AW planned and made several nonconsensual offensive contacts and batteries against plaintiff's neck, arms, wrists, legs, mouth, breast, vagina, butt, and anus.

60.     Defendant AW offensively and without consent assaulted and battered plaintiff by locking her neck, handcuffing her, tying her legs, and taking pictures and videos while he sexually assaulted her as she laid helplessly tied, so that he could better accomplish his forcible assaults and rapes.

61.     Defendant AW also offensively and without consent assaulted and battered plaintiff by penetrating plaintiff's vagina with sex toys multiple times, ejaculating inside her vagina, and around her genitals so that he could take more pictures and videos of his entire sexual assault and battery.

62.     Defendant AW's actions damaged plaintiff as described herein and below.

### COUNT II: FALSE IMPRISONMENT
### (Against Arisknight Winfree)

63.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

64.     Defendant AW unlawfully handcuffed and muzzled plaintiff. In doing so, he unlawfully restrained her personal liberty and freedom of movement without any authority so that she could not escape and look for help. Plaintiff was restrained not only during the entire sexual battery but until approximately 2:30 A.M. when she was dumped at the bus

14

Exhibit A

station.

65.     Defendant AW restricted plaintiff's liberty with the intent to confine her. Defendant AW's actions (locking her neck; handcuffing; tying of the legs; placing a hand on her month and nose; and a gag ball on her mouth) resulted directly in the confinement of plaintiff; and plaintiff was conscious of the confinement and restriction.

66.     Defendant AW's actions damaged plaintiff as described herein and below.

### COUNT III: INVASION OF PRIVACY
### (Against Arisknight Winfree)

67.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

68.     Defendant AW accomplished the removal of plaintiff's clothing against her will and he handcuffed her. Without her consent, defendant AW sexually assaulted her as she was helpless and took pictures and videos of her face, naked body, and private parts.

69.     Defendant AW's actions constitute an invasion of privacy as an intrusion upon plaintiff's seclusion or solitude, and into her private and intimate parts.

70.     Plaintiff had a right to not be forced to be naked in front of defendant AW, not to have sexual intercourse, and to not have pictures or videos of her naked without her free and voluntary consent. This is a complete private matter, and an absolute and ultimate personal decision.

71.     Defendant AW's invasion of plaintiff's privacy caused damages that are described herein and below.

### COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Arisknight Winfree)

72.     Plaintiff adopts, repeats, realleges, and incorporates by reference the

15

## Exhibit A

allegations set forth in the preceding paragraphs as though they were set forth fully herein.

73.   Defendant AW took advantage of plaintiff helpless state as she was handcuffed and muzzled. She was forced to provide voluntary consent, in order to accomplish his multiple torts, as described above.

74.   Defendant AW's conduct was extreme and outrageous, going beyond all bounds of decency, and was atrocious and utterly intolerable in any civilized community.

75.   Defendant AW's conduct was intentional, without justification, and caused plaintiff severe anguish and emotional distress.

76.   Defendant AW's conduct directly caused plaintiff to suffer emotional distress and sever anguish.

77.   Defendant AW's conduct damaged plaintiff as described herein and below.

### COUNT V: CONVERSION
### (Against Arisknight Winfree)

78.   Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein

79.   Defendant AW stole money and personal properties of plaintiff among which clothes and a perfume. Defendant AW wrongfully exerted dominion over the personal properties of plaintiff and in denial of her rights.

80.   Defendant AW also violated MCL § 600.2919a when he stole plaintiff's property for his own use.

81.   Plaintiff is entitled to recover treble damages, plus costs, and attorneys' fees.

### COUNT VI: GROSS NEGLIGENCE
### (Against Lisaurel Winfree, Jane Winfree, David Winfree)

82.   Plaintiff adopts, repeats, realleges, and incorporates by reference the

Exhibit A

allegations set forth in the preceding paragraphs as though they were set forth fully herein.

83.     Defendant AW could not design and execute the sexual assault and imprisonment plan against plaintiff without the material support of co-defendants Lisaurel Winfree ("defendant LW"), Jane Winfree ("defendant JW"), and David Winfree ("defendant DW", and the three individuals all together as "co-defendants"). Defendant JW and defendant DW put at disposal the 343 Highland Avenue property to defendant AW so that he could occupy and control the premises while pretending to be a "family" with a niece and commit criminal activity and tortious acts. Defendant JW, defendant DW and defendant LW provided family pictures and a toddler niece in need of babysitting to post on the Au Pair platform. Defendant AW acted as agent of co-defendants.

84.     On October 12, 2022, defendant DW met with plaintiff, the "aupair from Italy" who travelled from overseas to babysit defendant LW's daughter for three months while living on his property at 343 Highland Avenue (the "premises").

85.     Co-defendants owed a duty to plaintiff to use ordinary care and act as a reasonably prudent person would in hosting a foreign aupair on their property at 343 Highland Avenue.  Co-defendants'failed to exercise reasonable care including but   not limited to, the following:

(a) a duty to exercise reasonable care in protecting invitees and guests from the risk of sexual assault and imprisonment while on the premises;

(b) a duty to exercise reasonable care in planning an aupair stay to protect her from the risk that she would be unable to alert anyone when facing any dangerous situation, among which sexual assault and imprisonment;

Exhibit A

    (c) a duty to exercise reasonable care in maintaining policies and protocols to protect any aupair from the foreseeable risk of sexual assault and imprisonment while visiting from abroad and living on the premises;

    (d) a duty to exercise reasonable care in providing preliminary instructions and guidance to aupair participants for mitigating the risk of sexual assault and imprisonment;

    (e) a duty to exercise reasonable care in supervising any aupair participant during her travel and stay on the premises;

    (f) a duty to exercise reasonable care in adequately supervise, manage, and direct defendant AW's behavior while hosting an aupair while performing the babysitting duties.

86.    Co-defendants' duties arose when they complicitly and materially created the conditions that allowed defendant AW to attract plaintiff in the US and when they blindly did not stop defendant AW to use the premises to sexually assault and imprison plaintiff.

87.    **Co-defendants' duties arose** when they entrusted defendant AW to determine the logistics of all aspects of marketing on the platform, travel arrangements, accommodations, babysitting, for the aupair traveling from abroad.

88.    Co-defendants duties arose from a special relationship with plaintiff when she entrusted defendant AW, a member of the Winfree family, with full control over all aspects of her travel arrangements, accommodations, and activities of the aupair (from travelling logistics, to ESTA violations).

Exhibit A

89.    The sexual assault and false imprisonment of plaintiff were foreseeable and likely, and co-defendants recognized the risk of sexual assault and imprisonment for young female aupairs traveling from abroad and staying on the premises.

90.    Co-defendants breached their duties by their acts and omissions including, but not limited to, the following:

(a) failing to protect plaintiff from the foreseeable risk of sexual assault and false imprisonment while traveling in the US;

(b)    failing to protect plaintiff from the foreseeable risk of sexual assault and false imprisonment at the hands of defendant AW;

(c)    failing to adequately supervise and monitor defendant AW.

91.    As a direct and/or proximate result of co-defendants' actions and/or inactions, plaintiff suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

### COUNT VI: NEGLIGENCE
### (Against Lisaurel Winfree, Jane Winfree, David Winfree)

92.    Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

93.    Codefendants owed a duty to plaintiff, a participant of the aupair program,

19

Exhibit A

to act as a reasonably prudent person would. Co-defendants' duties included, but were not limited to, the following:

(a) a duty to exercise reasonable care in protecting aupair guests from the foreseeable risk of sexual assault and imprisonment while being hosted at the premises;

(b) a duty to exercise reasonable care in protecting aupair guests from the foreseeable risk of sexual assault and imprisonment by defendant AW;

(c) a duty to exercise reasonable care in providing a safety environment during the entire stay of the aupair on the premises;

(d) a duty to exercise reasonable care in ensuring that the premises' host would abide by the laws in Michigan while hosting an aupair;

(e) a duty to exercise reasonable care in adequately supervising aupairs selected to babysit a family toddler.

94.     Do-defendants' duties arose when they allowed defendant AW to create, offer, administer, and took responsibility for the aupair program and let him look for a young worker babysitting his niece.

95.     Co-defendants' duties arose from a special relationship with plaintiff when she entrusted defendant AW, a member of the Winfree family, with control over her safety and security during the aupair program.

96.     Plaintiff's sexual assault and imprisonment were foreseeable and likely, and co-defendants recognized the risk of sexual assault for aupairs being hoted on the premises.

97.     Codefendants breached their duties by its acts and omissions including, but not

Exhibit A

limited to, the following:

(a)     allowing defendant AW to look for an aupair to babysit defendant LW's daughter;

(b)     failing to protect plaintiff from the foreseeable risk of sexual assault and imprisonment during the time she was hosted on the premises;

(c)     failing to protect plaintiff from the foreseeable risk of sexual assault and imprisonment by defendant AW;

(d)     failing to adequately train and supervise defendant AW.

98.     As a direct and/or proximate result of co-defendants' actions and/or inactions, plaintiff suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation. Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Lisaurel Winfree, Jane Winfree, David Winfree)

99.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

100.     Co-defendants took advantage of plaintiff's vulnerable status as a foreign visitor in the US as she was handcuffed and muzzled. She was forced to provide voluntary consent, in order to accomplish his multiple torts, as described above.

101.     Codefendants' conducts were extreme and outrageous, going beyond all bounds of decency, and were atrocious and utterly intolerable in any civilized community.

102.     Co-defendants' conduct was reckless as to demonstrate a substantial lack of

Exhibit A

concern for whether one or more injuries would result and caused plaintiff severe anguish and emotional distress.

103.     Co-defendants' conduct directly caused plaintiff to suffer emotional distress and sever anguish.

104.     Co-defendants' conduct damaged plaintiff as described herein and below.

### COUNT VIII: CONSPIRACY TO COMMIT UNLAWFUL ACTS
### (Against Arisknight Winfree, Lisaurel Winfree, Jane Winfree, David Winfree)

105.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

106.     Defendant AW and co-defendants LW, JW, and DW entered into an agreement to commit several unlawful acts among which the enticing and coercion of plaintiff in the US to work as an aupair for the Winfree family without a working authorization and with the intent of exploiting plaintiff.

107.     Plaintiff travelled to the US and to East Lansing to work as an aupair for the Winfree family. She was assigned a room at the 343 Highland Avenue premises. She was told to clean the premises and she did it. She was introduced to defendant DW on October 12, 2022 as the aupair from Italy. These are material acts in furtherance of the conspiratorial agreement.

108.     Defendant AW and co-defendants' conduct directly caused plaintiff to suffer emotional distress and sever anguish.

109.     Co-defendants' conduct damaged plaintiff as described herein and below.

### COUNT IX: GROSS NEGLIGENCE
### (Against Agent Au Pair Inc.; Multikultur E.K.; Rafael Bujara)

110.     Plaintiff adopts, repeats, realleges, and incorporates by reference the

Exhibit A

allegations set forth in the preceding paragraphs as though they were set forth fully herein.

111.    Defendant AW could not plan and execute the sexual assault against plaintiff without the support of defendant Agent Au Pair Inc. ("defendant AAP"), defendant Multikultur ("Defendant MEK"), and defendant Rafael Bujara ("defendant RB") because these last three co-defendants put at disposal of defendant AW the website platform ([www.aupair.com](www.aupair.com) ) to capture plaintiff. In other words, defendants AW, LW, JW, and DW would not be able to commit the crime but for the existence of this website platfom.

112.    Co-defendants AAP, MEK, and RB provided defendant AW the platform, an account, a database to look for potential aupair victims, and a means to communicate directly with plaintiff.

113.    On September 5, 2022, co-defendant AAP, MEK, and RB facilitated the meeting between plaintiff and defendant AW.

114.    Co-defendant AAP, MEK, and RB owed a duty to plaintiff to use ordinary care and act as a reasonably prudent person would in selecting, vetting, and facilitating the interactions between a foreign aupair and a US family.  Co-defendants AAP. MEK and RB's duties included, but were not limited to, the following:

  (a)    a duty to exercise reasonable care in protecting aupairs from the risk of abuse, sexual assault, and false imprisonment while hosted by any US family;

  (b)    a duty to exercise reasonable care in selecting, vetting, and limiting only the listing of US families who have certain proven requisites and that do not pose risks for young aupair females who intend to visit the US and work for them;

  (c)    a duty to exercise reasonable care in facilitating aupair workers' stay in the US and

Exhibit A

protecting young women, and especially plaintiff, from the risk that she would be taken advantage, molested, abused, and/or unable to alert personnel of co-defendants AAP, MEK, and RB when facing any dangerous situation, among which sexual assault and imprisonment while in the US;

(d)     a duty to exercise reasonable care in maintaining local personnel, active policies, and protocols to protect any aupair, and plaintiff in particular, from the foreseeable risk of being predated, sexually assaulted and falsely imprisoned while visiting in the US and living with a US family;

(e)     a duty to exercise reasonable care in providing preliminary instructions and guidance to aupair participants, and plaintiff in particular, for mitigating the risk of abuse, sexual assault, and false imprisonment;

(f)     a duty to exercise reasonable care in monitor any aupair, and plaintiff in particular, and supervise US families during the aupair stay with the US host family;

(g)     a duty to exercise reasonable care in adequately supervise, manage, correct, and direct US families' behavior while hosting an aupair who is performing the aupair duties.

115.     Co-defendants AAP, MEK, and RB' duties arose when they blindly, complicitly, and materially created the conditions that allowed defendant AW to freely create an account of a US family on the platform, contact, and attract plaintiff in the US.

116.     Co-defendants AAP, MEK, and RB's duties arose when they flagged defendant AW as a problematic account and highly suspicious post but nevertheless they allowed defendant AW's post on the platform allowing him to predate plaintiff.

24

Exhibit A

117.    Co-defendants AAP, MEK, and RB duties arose from a special relationship that plaintiff formed when she entrusted defendant AW as a US family vetted and selected by the personnel of the co-defendants AAP, MEK and RB, so that defendant AW words and travel instructions were perceived by plaintiff as credible and valuable (e.g. from travel arrangements, accommodations, activities logistics or ESTA issues).

118.    The sexual assault and imprisonment of plaintiff were foreseeable and likely, and co-defendants AAP, MEK, and RB knew and recognized the risk of sexual assault and imprisonment of young females and of plaintiff in particular, traveling from abroad and staying with US families.

119.    Co-defendants AAP, MEK, and RB breached their duties by their acts and omissions including, but not limited to, the following:

(d)    failing to protect plaintiff from the foreseeable risk of sexual assault and false imprisonment while staying with a US family;

(e)    failing to protect plaintiff from the foreseeable risk of sexual assault and false imprisonment at the hands of a US family;

(f) failing to adequately supervise and monitor defendant AW, a US family;

(g)    failing to adequately remove from their platform flagged accounts;

(h)    permitting sexual predators to create unvetted accounts on their platform;

(i)    failing to warn, instruct, and put at disposal of plaintiff instructions, warnings, directions to follow in case of actual risks of abuse, sex

Exhibit A

assaults and imprisonment.

120.     As a direct and/or proximate result of co-defendants AAP, MEK, and RB's actions and/or inactions, plaintiff suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT X: GROSS NEGLIGENCE
### (Against Agent Au Pair Inc.; Multikultur E.K.; Rafael Bujara)

121.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

122.     Co-defendants AAP, MEK, and RB voluntarily accepted plaintiff into a relationship that required co-defendants to act as fiduciary in a relationship with her.

123.     Some of co-defendants AAP, MEK, and RB's fiduciary duties are outlined in the State Department's *au pair* regulation. 22 C.F.R. § 62.31.

124.     Plaintiff relied on co-defendants prior vetting and due diligence of their host US families on their website, on her travel arrangements, on any logistical instruction, and in general on co-defendants to act with the utmost trust and confidence in dealing with plaintiff. Co-defendants AAP, MEK, and RB violated the general obligations of sponsors as per 22 C.F.R. § 62.9.

125.     Co-defendants AAP, MEK, and RB are required by their agreement with the Department of State and the aupairs and by federal statute to protect the interests of the aupair

Exhibit A

workers as per 22 C.F.R. § 62.9.

126.     Co-defendants AAP, MEK, and RB violated regulation 22 C.F.R. 62.10 when they failed to properly and safely administer the aupair program.

127.     As a direct and/or proximate result of co-defendants AAP, MEK, and RB's actions and/or inactions, plaintiff suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT XI: NEGLIGENCE
### (Against Defendants Agent Au Pair Inc.; Multikultur e.K.; Rafal Bujara)

128.     Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

129.     At all times relevant to this action, defendants AAP, MEK, and RB had a duty to exercise reasonable care, and to comply with the existing standards of care, in the drafting, preparation, design, research, development, marketing, promotion and sale of the aupair service in the US through the www.aupair.com platform which defendants introduced into the stream of commerce, including a duty to ensure that users (namely potential au pair teenagers and families) would not suffer from unreasonable, dangerous harms.

130.     At all times relevant to this action, defendants AAP, MEK, and RB had a duty to warn all users, potential au pairs and US families, of the risks, dangers, and potential harms caused by sexual predators capable of exploiting an open platform, namely a platform that

Exhibit A

allows users to be rerouted to phones and personal messaging systems.

131.    At all times relevant to this action, defendants AAP, MEK, and RB knew or reasonably should have known that the www.aupair.com website platform was inherently dangerous and unreasonably defective when used as directed and as designed for two main reasons:

    (a)    defendants AAP, MEK, and RB knew that the platform has been used in the past by other sexual predators;

    (b)    defendants AAP, MEK, and RB knew that defendant AW has been already flagged as a potential sexual predators;

    (c)    defendants AAP, MEK, and RB did not put in place a safe harbor system to monitor, filter, and control the interactions between users and avoid that the platform would be used as an easy predatory application or a true "fishing pond".

132. Based on what they knew or reasonably should have known as described above, the defendants AAP, MEK, and RB deviated from principles of due care, deviated from the standard of care, and were otherwise negligent in one or more of the following particulars:

    (a) In failing to adopt a certain basic and inexpensive safeguard tools (like those existing in hundreds of service websites worldwide) to run a basic due diligence of the users;

    (b) In failing to adopt a certain basic and inexpensive safeguard communication tools that keep users linked to the platform and prevents them from exchanging personal information and be moved out of the platform, as strongly recommended by the

28

Exhibit A

Department of Justice [14] and by the US DOJ Project Safe Childhood [15] that is a nationwide initiative to combat the growing epidemic of child sexual exploitation and abuse launched in May 2006 by the DOJ;

(c) In failing to instruct or warn their users, US families and potential aupair candidates, that the www.aupair.com website lacks certain safety tools and private communication feature so that sex predators are capable of predating other users and reroute them outside of the platform;

(d) In failing to disclose to the plaintiff that defendant AW has been already flagged as a potential sexual predator.

133. At all relevant times, defendants AAP, MEK, and RB knew or reasonably should have known that defendant AW was an imposter and a sexual predator because defendant AW was already flagged and removed from the www.aupair.com platform by the same defendants.

134. The defects of the www.aupair.com service product platform were a substantial contributing cause of the injuries and damages suffered by plaintiff.

135. The injuries and harm suffered by plaintiff were the reasonably foreseeable results of defendants AAP, MEK, and RB's negligence. Had defendants AAP, MEK, and RB introduced such safety tools, plaintiff would not have been trapped into traveling to the US and to the house of a sexual predator and suffered the harms she suffered.

**COUNT XII – STRICT LIABILITY**
**(Against Defendants Agent Au Pair Inc.; Multiukultur e. K; Rafael Bujara)**

---

[14] Information available here https://www.justice.gov/usao-ndga/protecting-yourself-while-using-internet
[15] Information available here https://www.justice.gov/psc/about-project-safe-childhood

Exhibit A

136. Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

137. Plaintiff is in the class of persons that the defendants AAP, MEK, and RB should reasonably foresee as being subject to the harm caused by defectively designed website as Plaintiff was the type of person for whom the aupair service was intended to use.

138. Defendants, which are engaged in the business of selling the product service of aupair (pairing US families with foreign young workers), designed and created the www.aupair.com website and placed it into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with its design.

139. The website www.aupair.com that plaintiff used was defective in design and architecture and unreasonably dangerous as it reached the user, plaintiff, without basic protective features and in the condition in which it was placed in the stream of commerce. In comparing www.aupair.com website to a moving vehicle, it lacks seatbelts, emergency brake system, and rear mirrors.

140. The website www.aupair.com created by defendants AAP, MEK, and RB is unreasonable and dangerously defective beyond the extent contemplated by ordinary users with ordinary knowledge regarding these kind of services.

141. Defendants AAP, MEK, and RB's www.aupair.com website is defective due to lack of warning.

142. Defendants AAP, MEK, and RB's www.aupair.com website is defective due to inadequate warning or instruction because, after defendants flagged and attempted to remove defendant AW as a user, they knew or should have known of the risk of injury

30

Exhibit A

that defendant AW could have caused to potential victims but defendants AAP, MEK, and RB failed to provide adequate warnings to the community, and continued to allow defendant AW access to their platform.

143. The product defects alleged above were a substantial contributing cause of the injuries suffered by plaintiff. Specifically, the fact that defendant AW was able to easily enter into contact with plaintiff and reroute her to a personal communication system caused plaintiff to suffer sexual assault and imprisonment, resulting in the harms and damages described here below.

### COUNT XIII – STRICT LIABILITY – FAILURE TO WARN
### (against Defendants Agent Au Pair Inc.; Multikultur e.K.; Rafael Bujara)

144. Plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

145. Defendants AAP, MEK, and RB created a www.aupair.com website and placed it into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with its design and/or product service.

146. Defendants AAP, MEK, and RB's website is defective due to lack of warning concerning the risk that young aupairs could have been contacted by sex predators and should have been warned not the exchange their personal information or discuss relevant matters concerning the aupair experience beyond the website platform.

147. Defendants AAP, MEK, and RB's website was defective due to inadequate warning or instruction because, after defendants AAP, MEK, and RB knew of the risk of harm posed by defendant AW, they failed to provide adequate warnings to the user community of their website, but continued to promote the aupair service through their www.aupair.com

Exhibit A

website as a safe and effective service venue.

148. The lack of warnings on the www.aupair.com website was a substantial factor in bringing about the injuries to the plaintiff.

149. As the direct and proximate cause of the defective design of the website www.aupair.com as created and marketed by defendants AAP, MEK, and RB, and specifically their failure to warn, and their negligence, carelessness, other wrongdoing and actions described herein, Plaintiff suffered those injuries and damages as described with particularity below.

## **DAMAGES**

150. Defendants AW, LW, JW, DW, AAP, MEK, and RB's actions have directly and proximately caused Plaintiff great damages, including but not limited to emotional and mental distress, depression, fear, anguish, shock, embarrassment, mortification, outrage, stress, loss of enjoyment of life, and physical injuries. These injuries not only currently effect plaintiff but will require future medical and psychiatric care. Plaintiff will never again be the same person she was prior to the defendant's actions.

151. Defendants' conducts, as described above, warrants the greatest possible combination of punitive, exemplary, and other compensatory damages, WHEREFORE, Plaintiffs pray for judgment against defendants, jointly and severally, for Ten Million Dollars ($10,000,000) compensatory damages, plus interest, costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor, against defendants and award the following relief:

## Exhibit A

(i)     Compensatory damages for injuries sustained in an amount to be determined at trial;

(ii)    Punitive and/or exemplary damages in an amount to be determined by the trier of fact;

(iii)   Attorney fees, costs, and prejudgment interest;

(iv)    Other declaratory, equitable, and/or injunctive relief including, but not limited to, implementation of institutional reform and measures of accountability to ensure the safety and protection of aupairs traveling in the US including but not limited to the revocation of the designation of sponsor agency for defendants AAP and MEK; and

(v)     Any further relief as this Court deems just and proper under the circumstances.

### JURY DEMAND

Plaintiff, Ms. Jane Doe, hereby demands a jury trial on any cause of action and claim with respect to which there is a right to a jury trial.

Dated: May 17, 2023                              Respectfully Submitted,

                                                 By: *Luca CM Melchionna*

                                                 Luca CM Melchionna
                                                 Melchionna, PLLC
                                                 437 Madison Avenue, 24 Floor
                                                 (646) 595-8230
                                                 lcmm@melchionnalaw.com


                                                 *Counsel for Plaintiff*