UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - -

UNITED STATES OF AMERICA,

  Plaintiff,

v.

ARISKNIGHT ARKIN-EVERETT WINFREE,

  Defendant.
_____/

Case No. 1:23-CR-15

Hon. Hala Y. Jarbou
Chief United States District Judge

**DEFENDANT ARISKNIGHT WINFREE'S BRIEF IN SUPPORT
OF MOTION FOR DOWNWARD VARIANCE**

On October 7, 2024, this Court will sentence Arisknight Winfree following his nolo contendere plea to counts one through five of the indictment. United States Probation calculated Mr. Winfree's total offense level to be 43[1] and assigned him a criminal history category I. (R. 88, presentence report ("PSR") ¶ 238, PageID.369.) As set forth in the accompanying sentencing memorandum, Mr. Winfree maintains a single objection to the final presentence report. Even if the Court sustains that objection, however, the guidelines range will be unaffected. Accordingly, if all proposed sentencing enhancements are applied, Mr. Winfree's advisory guideline range would be life. (*Id.*)

For the reasons set forth below, Mr. Winfree respectfully asks the Court to impose a sentence below the advisory guidelines range.

---

[1] "Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, in this case 46, the offense level will be treated as a level 43." (PSR, ¶ 151.)

**FACTUAL AND PROCEDURAL BACKGROUND**

The facts of the case are well-established in the reports giving rise to the allegations, the indictment, and the PSR. Because Mr. Winfree pled no contest to the five counts in this matter, he does not offer his own recitation of the facts. In short, the evidence would demonstrate that during a brief and tumultuous period of his life Mr. Winfree engaged in a series of sex crimes, some of which included convincing would-be au pairs to come to his home in East Lansing, Michigan. Undoubtedly, these crimes were egregious, morally abhorrent, and without any excuse or justification. Mr. Winfree has accepted responsibility for these crimes, indicating to the Court that his "own poor choices" have resulted in "emotional and psychological scars" for the victims and "extreme stress and emotional heartbreak" for his own family members. (R. 88, PSR, p. 25-26, ¶ 117.) And, of course, Mr. Winfree's own life has been destroyed by his actions. He struggles with nightmares, has lost friendships, and has seen firsthand the "rupture of trust in the community" that his actions have caused. (*Id.*)

While there is no excuse for Mr. Winfree's conduct in this case, there are some contributing factors. As further discussed below, Mr. Winfree is himself a victim of sexual assault—an assault that took place when he was between 7 and 10 years old at the hands of the very same "friend" who introduced him to many of the concepts that matured into the crimes in this case. (*Id.* at ¶ 191.) Mr. Winfree also suffers from previously undiagnosed and unmedicated Narcissistic Personality Disorder with Antisocial Personality Disorder Traits. (*Id.* at p. 49, ¶ 208.) While the BOP ruled out Bipolar I disorder (*Id.* at ¶ 205), Mr. Winfree was previously diagnosed with bipolar disorder in 2023 and

2

began taking medication for it in May of that year. (*Id.* at ¶ 202.) He reports that he feels much better on the medication and "wish[es] [he] had sought help sooner." (*Id.*)

The PSR also includes many in-depth descriptions of Mr. Winfree's severe and repeated bouts with mania, delusion, depression, and—for all intents and purposes—a complete disconnection from reality. (*See, e.g.*, *Id.* at ¶ 209 ("Mr. Winfree described, 'in these states [manic states] I am "inevitable" and believe I have Godlike powers and that the world and universe is my domain.' In discussion of his life during the alleged incident, Mr. Winfree referenced feeling 'capable of anything.' When discussing his alleged offenses, Mr. Winfree explained 'at the time I thought I was irresistible, why would you not want to have sex with me.' Additionally, he expressed being 'charismatic' to the point where he could, 'make other people believe my delusions.' On one occasion, he detailed receiving a job which paid $7,500 per month. When asked how he was hired without completing his education, Mr. Winfree responded due to his 'extreme charisma.'") While Mr. Winfree was found to be competent and capable of understanding right and wrong for purposes of these proceedings, he was clearly a deeply troubled person at the time of these offenses.

In the PSR, after calculating a total offense level of 43, the author recommended a life sentence. Given the contributing factors discussed above and further below, Mr. Winfree respectfully requests a downward variance from the recommended sentence.

**ARGUMENT**

As the Court is aware, when sentencing a defendant who has been found guilty of a crime, this Court must comply with the basic aims of sentencing set forth in 18 U.S.C. § 3553(a). *Rita v. United States,* 551 U.S. 338, 348 (2007). The Court should "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 522 U.S. 85, 101 (2007). While courts must continue to consider the sentencing guidelines, they are no longer mandatory, and courts are only required to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7) (cleaned up).

In determining the "need for the sentence imposed" under the second factor, the Court should craft a sentence "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §

3553(a)(2)(A)-(D); *see Kimbrough*, 552 U.S. at 101. In *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006), the Sixth Circuit held that, after *United States v. Booker*, 543 U.S. 220 (2005), a judge must impose the lowest sentence that is minimally sufficient to meet those goals, whether that sentence consists of probation, time served, a mandatory minimum sentence, the statutory maximum sentence, or somewhere in between. In this case, several of the factors are particularly relevant.

**A. The Need for the Sentence Imposed Should Consider Treatment Options; Mr. Winfree's Need is Clear**

There is no question that the nature and circumstances of the offenses here warrant a significant sentence. But Mr. Winfree asks the Court to consider how best to craft a sentence that satisfies the "need for the sentence imposed." Specifically, the Court should consider a sentence "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

Mr. Winfree is a young man in his early thirties. Despite having a relatively normal childhood, something clearly went wrong. (R. 88, PSR, ¶ 192 ("Mr. Winfree remembered swimming, running track, playing soccer, playing piano, singing, going to church, participating in mathletes, reading, cooking, hiking, walking, and playing video games as a child . . . He stated he experienced a severe panic attack at age 19, which led to him dropping out of school.") While the reasons for bipolar disorder, manic-depressive tendencies, and narcissistic personality disorder are beyond the scope of this brief, Mr. Winfree does impress upon the Court the effect of those mental disorders on his life. And, in particular, he would point the Court to the effects of one person: Paul Heiselman. In

5

reviewing the PSR, one is struck by the consistent influence that Heiselman had on Mr. Winfree, and never for the better. Mr. Winfree reports that, when he was a young child, between 7 and 10 years old, Heiselman made Mr. Winfree shower with him and commit sexual acts with Heiselman.

Further, it was Heiselman who "screened" the potential victims that Mr. Winfree found, as Mr. Winfree "sent the profiles to Mr. Heiselman at Mr. Heiselman's request, and Mr. Heiselman would then approve or disapprove of who would be invited to the residence." (*Id*. at ¶ 81.) It was Heiselman who, after Mr. Winfree sent him an illicit photo would "ask[] for more images," even logging into the security cameras to be a voyeur to what was happening in the house. (*Id*. at ¶ 86-87; 90.) It was Heiselman who convinced Mr. Winfree to pretend to have a family online, because "parents would not allow an au par to come to a single man's house." (*Id*. at ¶ 98.) It was Heiselman who coached Mr. Winfree on how to "slowly remov[e] the children from the messaging with the au pairs" to imply that the relationship was going to be a sexual one and then, upon arrival, to begin grooming the victims with requests for massages. (*Id*. at ¶ 100-01.) And it was Heiselman who told Mr. Winfree to "restrain[] the au pairs if they did not comply with sexual advances." (*Id*. at ¶105.)

Mr. Winfree is a young man who needs *and needed* help. And he believed that his good friend, Paul Heiselman, was there to help him. When Mr. Winfree was pushing everyone away in a mental health crisis, his parents would "reach out to Paul Heiselman to get any information and make sure he was okay. Paul was his *best friend*. ArisKnight tended to *follow and listen to Paul*." (Ex. A, Jean Winfree Letter, 2 (emphasis added).) But

6

Heiselman was not a friend. In fact, Heiselman instead served as the near-constant voice in Mr. Winfree's life pushing him further down a path into delinquency.

Ultimately, it was Mr. Winfree who made his own decisions, and he alone bears responsibility for the consequences. But in fashioning an appropriate sentence, Mr. Winfree asks the Court to consider Heiselman's impact, along with what treatment options are available to him. 18 U.S.C. § 3553(a)(2)(D). He asks the Court to impose the lowest sentence that is minimally sufficient to meet the other goals outlined in section 3553, especially considering his history of mental health. Mr. Winfree, with appropriate treatment, will not be the same person at age 40, 60, or 80 years old. A life sentence would confine him to prison for perhaps the next 60 or more years, never giving him an opportunity to demonstrate that he can change. Mr. Winfree believes that—with treatment—he can change his habits, his way of engaging with the world, and his narcissistic tendencies. He can turn from that path of delinquency that Mr. Winfree chose to walk down, and which has been encouraged and cultivated by Heiselman, and he can re-enter society as a changed person.

### B. Mr. Winfree's Family Provides Additional Context Demonstrating Need for Treatment.

In further support of his request for a variance, Mr. Winfree is attaching four letters of support from his family. Those letters share a common theme: Mr. Winfree was a gifted, kind child who began to struggle as he moved into his teen and young-adult years. (*See* Exs. A-D.) And his family asks the Court to give Mr. Winfree a chance to return to that kind young man that he once was. David Winfree, Mr. Winfree's father, writes that Mr. Winfree enjoyed family vacations, soccer games, religious and spiritual books, and

involvement in the children's choir. (Ex. D., D. Winfree Letter, 1.) Unfortunately, though, as he entered his teen years, "something shifted." (*Id*.) As he processed the world around him more quickly than others, "his communications, emotional reactions, and behavior appeared out of proportion, distorted, and outside of the expected norm." (*Id*. at 2.) These problems became worse, and Mr. Winfree's father believes that "his being in a highly disassociated, manic, tunnel-focused state of mind significantly contributed" to these crimes. (*Id*. at 3.) Still, he holds out hope for his son. "I hope there will be potential for him to be released," David Winfree says, "and eventually recover the positive and beautiful parts of himself and make constructive contributions to society." (*Id*.)

Likewise, Mr. Winfree's mother writes that he "was much loved by his family" and "was a very loving child." (Ex. A, Jean Winfree Letter, 1.) Even so, as a child and teenager, he showed manic-depressive tendencies: "He could be extremely well behaved for several days in a row and then become extremely difficult for several days." (*Id*.) These tendencies got worse in his early twenties and, "at one point, [his family] considered calling 9-1-1 to have him involuntarily committed to a hospital." (*Id*. at 2.) Ms. Winfree notes that she is "beyond devastated that [her] son's actions have caused great pain and damage to the community." And, still, she asks for leniency and that Mr. Winfree might "receive the medical and therapeutic treatment that he so badly needs." (*Id*.)

Mr. Winfree's aunt and uncle make similar pleas to the Court, acknowledging both the gravity of the instant offenses and the contributing factors to those crimes. (Ex. C-D.) Mr. Winfree recognizes that he has already been determined fit to stand trial and that his

8

mental health does not excuse the heinous things he did. He asks only that the Court consider his history, his need for treatment, and the sanctions available when crafting the sentence, ultimately varying downward from the recommendation of a life sentence.

### C. A Downward Variance Will Still Adequately Deter Future Conduct

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court must also consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Amy Baron-Evans, a leading scholar on federal sentencing and member of the Sentencing Resource Counsel, writes:

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence.

Amy Baron-Evans, *Sentencing by the Statute*, Defender Services Office, https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/sentencing-by-the-statute.pdf (Apr. 27, 2009). Thus, a vast increase in the length of the sentence, relative to administration of *some* punishment, does not increase the deterrent effect.

Mr. Winfree knows the administration of punishment is coming and that, in and of itself, is enough to provide the adequate deterrent effect the court must consider in determining the sentence. Deterrence will be accomplished as readily and as fully for Mr.

Winfree with a sentence of 20 years—as permitted for Counts 2 and 3—as it would be under a lifetime sentence. No doubt spending the majority of his working years in prison, from approximate age of 30 to the age of 50, will deter Mr. Winfree from ever committing these crimes again. For this reason, Mr. Winfree submits that deterrence can be accomplished even through a downward variance.

### D. The Need to Protect the Public from Further Crimes of Mr. Winfree

18 U.S.C. § 3553(a)(2)(C) instructs the Court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." The objective of this provision is to consider Mr. Winfree's risk of recidivism and what, if any, danger he poses to the public. As a defendant with a criminal history score of one, Mr. Winfree has demonstrated that his criminal propensity is tied to his mental health, with the majority of his criminal activity arising within a short window of less than two years. While Mr. Winfree's conduct in this case no doubt posed great danger to both domestic and foreign communities, his history does not demonstrate that he will be engaged in a life of crime. He *has* and *will* learn his lessons from this case. Whether he spends 20 years in prison or something more, he is confident that he will not be back before this Court.

### E. The Need to Avoid Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct" in determining a sentence. Pursuant to Section 3553(a)(3), the Court is to consider "the kinds of sentences available." The Court may sentence Mr. Winfree up to a life in prison. Because the Guidelines are advisory, the Court need not

sentence him to that maximum term, so long as the sentence is properly justified under 18 U.S.C. § 3553. When determining whether Mr. Winfree should receive a sentence below life in prison, he asks that the Court consider the sentences ordered in similarly situated cases, as it is required to do, along with the individual characteristics he possesses that differentiate him from others who have been similarly charged. Namely, he asks the Court to consider that he has himself been a victim of molestation (R. 88, PSR, ¶ 191), that he has been influenced deeply by an older, more sexually driven individual (*Id*. at ¶ 99), and that he desperately needs mental health treatment (*Id*. at ¶ 202).

## CONCLUSION

In asking for a variance, Mr. Winfree in no way intends to minimize the seriousness of his crimes. He is truly sorry for the choices he made and the person he became during this dark time. He is very aware that his decisions profoundly impacted the lives of many people, in ways that he should have foreseen but unfortunately ignored. For the reasons set forth above and which will be stated on the record at sentencing, Mr. Winfree respectfully requests that this Court vary from the advisory guidelines range and impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing enunciated by Congress in 18 U.S.C. § 3553(a). He respectfully requests that this Court impose a sentence below the recommended sentence in the PSR.

Respectfully submitted,

Dated: September 23, 2024

/s/ Heath M. Lynch
HEATH M. LYNCH (P81483)
SBBL LAW, PLLC
60 Monroe Center NW, Suite 500
Grand Rapids, MI 49503